**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MONARCH GEMS, J.B. & S. BROS.,** | ) | |
| **BHARGOVI, and KIRAN EXPORTS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | 04 C 7664 |
| | ) | |
| **MALCA-AMIT USA, L.L.C. and U.S.** | ) | |
| **BANK NATIONAL ASSOCIATION,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

This diversity action flows from defendant U.S. Bank National Association's involvement

with an international documentary transaction in connection with efforts by the plaintiffs

(partnerships organized under the Indian Partnership Act) to sell over $600,000 worth of

diamonds to Victor Aloush, an individual doing business in Chicago's diamond district.  After

Mr. Aloush received the diamonds, he failed to pay for them and the plaintiffs discovered he had

been convicted of robbery and burglary and had engaged in an elaborate scheme to defraud them.

The plaintiffs then sued U.S. Bank, contending that its actions vis-a-vis the documentary

transaction mean that it is liable for Mr. Aloush's failure to pay for the diamonds.  U.S. Bank's

motion for summary judgment is before the court.[1]  For the following reasons, this motion is

granted in its entirety.

---

[1]  The court previously granted a motion to dismiss filed by the other defendant, Malca-Amit USA LLC.  *See* Docket Nos. 48-49.  Only claims brought by Monarch Gems and Kiran Exports against U.S. Bank survive.  These claims are the subject of U.S. Bank's motion for summary judgment.

## I.    Background

The facts are largely uncontested, although the legal conclusions to be drawn from these facts are hotly disputed.  The plaintiffs included a number of legal conclusions in their statement of facts.  Because legal conclusions are not facts, the court has omitted them from its summary of the relevant facts.

### A.    The Parties and Other Relevant Individuals

The plaintiffs are Indian partnerships registered under the Indian Partnership Act and act as diamond merchants.  U.S. Bank is a national banking association engaged in the business of banking and finance.  Julie Malit is an employee of U.S. Bank, and worked out of U.S. Bank's 30 N. Michigan Avenue branch for several years.  Ms. Malit has been employed by U.S. Bank for more than eleven years.

Nimish Parikh is a partner in Niraj Enterprises, a diamond seller located in India.  Nimish Parikh also acts as a diamond broker who brokers transactions between diamond buyers and sellers for a fee.  Nimish Parikh resides in Mumbai, India.  Nimish Parikh testified as the plaintiffs' Rule 30(b)(6) corporate representative in this case.

Ygal Yaakov is a diamond cutter and the sole proprietor of Tel Aviv Diamond, which is located at 5 South Wabash Avenue, Suite 705, Chicago, Illinois.   The 5 South Wabash Avenue building is also known as the Maller's Building.  Tel Aviv Diamond is a fictitious name by which Mr. Yaakov does business, as opposed to a corporate entity.

Tel Aviv Diamond has been a customer of U.S. Bank since 1995.  As the sole proprietor of Tel Aviv Diamond, Ygal Yaakov transacted Tel Aviv Diamond business at the U.S. Bank branch formerly located at 30 N. Michigan, Chicago, Illinois on numerous occasions.  During at

least some of those visits, Ygal Yaakov worked directly with Julie Malit. During the course of Julie Malit's dealings with Ygal Yaakov, they developed a relationship whereby she came to know Ygal Yaakov and his business, Tel Aviv Diamond, including the fact that it is located at 5 South Wabash Avenue, Suite 705, in Chicago, Illinois.

Shay Sadina is a former employee of Tel Aviv Diamond, and was employed by Tel Aviv Diamond from 2001 through 2005. Julie Malit knew Shay Sadina because he made a number of deposits for Tel Aviv Diamond at the U.S. Bank's 30 North Michigan Avenue branch.

Nishit (a/k/a Nick) Parikh is Nimish Parikh's brother and owns Star Brilliant, a diamond wholesale business also located in the Maller's Building. Star Brilliant is a fictitious name by which Mr. Parikh does business, as opposed to a corporate entity. Star Brilliant was a customer of U.S. Bank from 2002 to 2004. As Star Brilliant's owner, Nishit Parikh transacted business in the U.S. Bank branch formerly located at 30 N. Michigan, Chicago, Illinois. During those visits, Julie Malit assisted Nishit Parikh on a number of transactions.

**B.    Victor Aloush**

Victor Aloush immigrated from Israel to the United States in 1995. Victor Aloush and Ygal Yaakov became friends shortly after Mr. Aloush's arrival in the United States. Around 2002 or 2003, Victor Aloush began "sitting" with Tel Aviv Diamond. When someone "sits" with a business owner in the diamond trade, he or she uses the owner's office, phone and fax machine to conduct their own business and, in return, pays the owner a commission based on the profits that he or she makes conducting their business.

Victor Aloush occupied one of two offices in Tel Aviv Diamond's suite, which was located at 5 South Wabash Street, Suite 705. While "sitting" in Tel Aviv Diamond's suite,

Victor Aloush conducted a diamond wholesaling business. Victor Aloush's office within Tel Aviv Diamond's office suite did not have a nameplate or identify the name of his company. Mr. Yaakov testified that a stranger walking in off the street would not be able to readily determine that Victor Aloush did not work for Tel Aviv Diamond.

Nishit Parikh first met Victor Aloush in the late 1990s. During July of 2003, Victor Aloush became interested in purchasing diamonds that Nishit Parikh could procure from India. At this same time, Victor Aloush printed a business card which represented that he was the President of a corporation named Tel Aviv Diamonds and Jewelry, Inc. Tel Aviv Diamonds and Jewelry, Inc., however, does not exist. Victor Aloush's business card listed the same address, suite number, and phone and facsimile numbers as Tel Aviv Diamond.

Victor Aloush had previously created a corporation named Tal Aviv Loose Diamonds & Jewelry, Inc. He testified that he created the Tel Aviv Diamond, Inc. (as opposed to Tal Aviv Loose Diamonds & Jewelry, Inc.) business card to make it appear that he was affiliated with Ygal Yaakov and Tel Aviv Diamond so Indian diamond sellers would do business with him, explaining: "[T]he Indian don't know me. They know Ygal more, you understand? . . . So, I just try to do it the same, you know what I mean?" Mr. Aloush's actions led the plaintiffs to believe that Tel Aviv Diamonds and Jewelry, Inc. was a legal corporate entity.

In July or August of 2003, Nishit Parikh informed his brother that Victor Aloush was with Tel Aviv Diamond and was looking to buy diamonds. The intent was for Nimish Parikh to broker diamond transactions between Victor Aloush and Indian diamond merchants with whom Nimish Parikh worked. Nishit Parikh performed an informal background check regarding Tel Aviv Diamond by speaking to individuals in the Maller's Building prior to referring Victor

Aloush to his brother. Nishit Parikh relied on the reputation of Tel Aviv Diamond when referring Victor Aloush to his brother.

As a broker, Nimish Parikh guarantees his sellers that he will pay the purchase price for any diamonds that is not paid by a buyer that Nimish Parikh presented by promising "if I have matched you with a criminal who doesn't pay, I will pay myself." In agreeing to broker sales for Victor Aloush, however, Nimish Parikh did not investigate Victor Aloush, but relied exclusively on his brother Nishit Parikh's referral. In doing so, Nimish Parikh agreed that he was "taking a fairly big personal risk." In fact, Nimish Parikh and his diamond merchant clients did not know that Victor Aloush had been accused of and had plead guilty to robbery and burglary in 2001. If Nimish Parikh had known this, he would not have done business with him. However, the Parikh brothers were, at this point, ignorant of the true state of affairs, so Nishit Parikh arranged a meeting in India between Nimish Parikh and Victor Aloush for the purpose of facilitating a deal for the sale/purchase of diamonds.

### C.    Victor Aloush's Diamond Purchases

In July or August of 2003, Victor Aloush and another individual (Nachum Gendelman) went to Mumbai, India to meet with Nimish Parikh to negotiate the purchase of diamonds. While on that trip, Victor Aloush purchased diamonds from plaintiff Monarch Gems using Nimish Parikh's services as a broker. In connection with that purchase, Monarch Gems did not use a collecting bank to process the collection documents. Instead, it shipped the diamonds directly to Mr. Aloush, who paid in full.

During Victor Aloush's visit to India, Victor Aloush gave Nimish Parikh his "Tel Aviv Diamonds and Jewelry, Inc." business card. Nimish Parikh did not conduct any due diligence

regarding this purported corporation, and did not have anyone search the Illinois Secretary of State's records to determine whether this corporation actually existed. When he later conducted an investigation on advice of counsel, he was unable to confirm that Tel Aviv Diamonds and Jewelry, Inc. existed.

In November of 2003, Victor Aloush and Nachum Gendelman again traveled to India to negotiate the purchase of additional diamonds. During this trip, Victor Aloush, acting as the purported President of the non-existent Tel Aviv Diamonds and Jewelry, Inc., purchased diamonds from a number of companies, including $118,932.40 worth of diamonds from plaintiff Monarch Gems and $110,735.05 worth of diamonds from plaintiff Kiran Exports. Victor Aloush agreed to pay for the Monarch Gems diamonds as follows: $50,000 within 60 days of delivery, and $68,932.40 within 90 days of delivery. He also agreed to pay for the Kiran Exports diamonds within 90 days of delivery. As the broker, Nimish Parikh guaranteed payment for the diamonds.

The plaintiffs did not independently verify if Victor Aloush/Tel Aviv Diamonds and Jewelry, Inc. could pay for these diamonds. Instead, they relied upon Nimish Parikh's representation that Victor Aloush and his purported company were trustworthy. In deciding to extend credit to Mr. Aloush, they also relied on the fact that Mr. Aloush had paid for his previous $100,000 diamond purchase and the protections afforded by their use of the international documentary collections process. Their trust in Mr. Aloush, however, was misplaced as he failed to pay for his November 2003 diamond purchases.

With the wisdom of 20/20 hindsight, the plaintiffs today assert that if they had known that Tel Aviv Diamonds & Jewelry, Inc. was not a corporate entity organized or registered in any

jurisdiction, nationally or internationally, they would not have done business with Mr. Aloush. They also assert that they chose to conduct its business with Tel Aviv Diamonds and Jewelry, Inc. using an American "collecting bank" to ensure that Tel Aviv Diamonds and Jewelry, Inc. was in fact a legal corporate entity with an existing business relationship with an American bank.

### D. The International Documentary Collections Process

Norma Bruneau, Vice President and Operations Manager for U.S. Bank's international trade operations in Milwaukee, Wisconsin, testified as U.S. Bank's Rule 30(b)(6) witness regarding its services as consignee in international documentary transactions. According to Ms. Bruneau, "international documentary collections" is a process by which a merchant engaged in the international sale of goods can deliver the goods via a carrier, and at the same time have its bank (known as the "remitting bank") deliver a set of shipping documents to a "collecting bank." Once payment is made by the purchaser or, in the case of a deferred term collection, once a promissory note is signed by the purchaser committing to pay for the goods, the shipping documents are delivered by the collecting bank to the purchaser. The purchaser then presents the shipping documents to the carrier, and is given possession of the goods.

The International Chamber of Commerce's Uniform Rules for Collections ("URC") 522 consists of guidelines for banks to follow in connection with international collections products. As occurred here, URC 522 is typically incorporated into the instructions provided by the remitting bank to the collecting bank. The URC defines the "remitting bank" as "the bank to which the principal has entrusted the handling of a collection." URC, Art. 3(a). The "collecting bank" is "any bank, other than the remitting bank, involved in processing the collection" and the "presenting bank" is "the collecting bank making presentation to the drawee." *Id*. Article 22 of

URC 522 specifically states, among other things, that "[t]he presenting bank is responsible for seeing that the form of acceptance of a bill of exchange appears to be complete and correct …" The typical collecting bank fee for a deferred term collection, such as those involved in this case, is $85.

Ms. Malit is a branch personal banker and is not a member of U.S. Bank's international collections department. She testified that she had never seen URC 522 prior to her deposition, that the subject international transactions were the first such transactions that she had been involved in, and that when she received the collection papers she contacted U.S. Bank personnel in U.S. Bank's international collections department who instructed her on how to handle the transactions.

### 1.    The Monarch Gems Shipment

In December of 2003, Monarch Gems used Malca-Amit, a carrier, to transport the diamonds that Victor Aloush purchased in his capacity as the President of the non-existent Tel Aviv Diamonds and Jewelry, Inc. during his November trip from India to Chicago. Monarch Gems used the international collections process in connection with this shipment. Monarch Gems' bank, Allabahad Bank, acting as the remitting bank, thus shipped collection documents, including instructions, a house airway bill and an invoice to U.S. Bank, which was designated as the collecting bank. The collection documents indicated that they should be delivered to Tel Aviv Diamond and Jewelry Inc., at 5 South Wabash, Suite 705, Chicago, Illinois 60603.

The instructions that accompanied the Monarch Gems shipment specifically indicated that the transaction was subject to URC 522 by stating: "Special Instructions: Subject to Uniform Rules for Collection (1995 Revision) I.C.C. Publication No. URC-522." The collection

documents entitled the recipient to take possession of the diamonds from Malca-Amit after executing a note binding it to pay $50,000 within 60 days, and $68,932.40 within 90 days.

On December 10, 2003, Malca-Amit called Ygal Yaakov at his office at Tel Aviv Diamond to tell him that there was a shipment at U.S. Bank that needed to be "released." Ygal Yaakov then went to the U.S. Bank Branch at 30 N. Michigan to ask Julie Malit for the shipping documents. Nishit Parikh met Ygal Yaakov at the bank in connection with the transaction. Ms. Malit testified that she believed that Tel Aviv Diamond was the intended recipient of the shipping documents because (a) the collection documents were addressed to Tel Aviv Diamond & Jewelry, Inc. at the exact same address, including suite number, as Julie Malit knew Tel Aviv Diamond, a customer of U.S. Bank, to be located; and (b) Tel Aviv Diamond and Ygal Yaakov were active and familiar customers of U.S. Bank and Julie Malit. Indeed, Ygal Yaakov testified that there was no reason that Julie Malit should have known that the Monarch Gems documents were not for Ygal Yaakov or Tel Aviv Diamond.[2]

Ms. Malit, acting on instructions from U.S. Bank's international collection department, drafted the bill of exchange to name "Tel Aviv Diamonds," not "Tel Aviv Diamonds and Jewelry, Inc." With respect to the omission of the "and Jewelry, Inc.," Ms. Bruneau testified that "it is not uncommon for banks overseas to send us [U.S. Bank] documents and not have the name

---

[2] U.S. Bank produced Julie Malit to testify as its Rule 30(b)(6) witness regarding the specific facts relating to the subject transactions, as she was the U.S. Bank banker who interacted directly with Messrs. Yaakov, Sadina, Nishit Parikh and Aloush regarding the transactions. U.S. Bank produced Norma Bruneau, Vice President and Operations Manager for U.S. Bank's international trade operations in Milwaukee, Wisconsin, to testify as its Rule 30(b)(6) witness regarding U.S. Bank's services as consignee in international documentary transactions.

of the companies absolutely perfect.  At lot of times they have them jumbled up, in the wrong order."

On behalf of Tel Aviv Diamond, Ygal Yaakov signed the documents, including the promissory note agreeing to pay for the diamonds on the terms demanded by Monarch Gems. Ygal Yaakov did not bring up any concerns about his authority to retrieve the Monarch Gems collection documents or sign the note.

### 2.    The Kiran Exports Shipment

Approximately one week after Tel Aviv Diamond received the Monarch Gems collection documents, U.S. Bank received international collection documents from Andhra Bank relating to the purchase of diamonds from Kiran Exports.  The instructions received by U.S. Bank from Andhra Bank in connection with the Kiran Exports shipment indicated that U.S. Bank was to act pursuant to URC 522:  "This collection is subject to the Uniform Rules for Collection (1995) Revision, ICC Publication No. 522, except as otherwise expressly stated hereon."

The Kiran Exports collection documents indicated that the documents should be released to Tel Aviv Diamond and Jewelry Inc., 5 South Wabash, Suite 705, Chicago, Illinois, and further indicated that Tel Aviv Diamond and Jewelry, Inc. would have to sign a note agreeing to pay $110,735.05 within 90 days.  On December 19, 2003, Julie Malit called Ygal Yaakov to inform him that she had received additional collection documents.  Because he was out of town, Ygal Yaakov told Julie Malit that he would send Shay Sadina to sign for the documents in his absence.

Julie Malit was familiar with Shay Sadina as an employee of Tel Aviv Diamond, and Shay Sadina was in fact authorized to sign for documents on behalf of Tel Aviv Diamonds.  As with the Monarch Gems diamonds, Ms. Malit, acting on instructions from U.S. Bank's

international collection department, drafted the bill of exchange to name "Tel Aviv Diamonds," not "Tel Aviv Diamonds and Jewelry, Inc." Shay Sadina signed the required collection documents, including the promissory note agreeing to make payment within 90 days, on behalf of Tel Aviv Diamond.

With respect to both transactions, Ms. Bruneau of U.S. Bank's international collections department testified that, "[t]he address of the individual company is the same as the address that we hold for Tel Aviv Diamond. The principal who came into the bank who identified – who we do business with specifically told us that he was looking for documents covering the shipment. We have no reason not to believe that – that they are our customer. They have the same address, they are looking for a shipment of the same product out of the same country."

### E. Victor Aloush's Receipt of the Monarch Gems & Kiran Imports Diamonds

After he received the shipping documents for the Monarch Gems and Kiran Exports diamonds, Ygal Yaakov took possession of these diamonds from Malca-Amit and gave them to Victor Aloush. Presumably, Victor Aloush sold some of the diamonds. On January 23, 2004, Victor Aloush traveled to Milwaukee, Wisconsin to sell the rest of the diamonds. Mr. Aloush claims that he was robbed while in Milwaukee and filed a police report to this effect. On the police report, Victor Aloush indicated that he was employed by Tel Aviv Diamond, located at 5 South Wabash, Suite 705, Chicago, Illinois.

Victor Aloush has not paid for the Monarch Gems or Kiran Exports diamonds, but acknowledges that he is responsible for doing so. According to Mr. Aloush, he would have paid for the diamonds had he not been robbed. In February of 2004, a lawyer retained by "Nishit

Parikh & his family" sent a letter to Victor Aloush, Ygal Yaakov and Nachum Gendelman stating, inter alia, the following:

> You will please be advised that we have been retained by the family of Nishit Parikh to recover the sum of $563,945.85 due for merchandise delivered to and received by you in December of 2003, that you falsely claim was stolen on January 23, 2004. It has recently come to our attention that items you claim were stolen, including GIA certified stones, are currently being offered for sale on Bulls Eye Diamonds web site.
>
> We have contacted the FBI and are in the process of contacting the Cook County State's Attorney's Office and Mr. Aloush's Probation Officer to report this incident. We intend to vigorously pursue every legal means available to us to make Mr. Parikh and his family whole. In a business that is based upon honor and trust, the 3 of you are most certainly a disgrace.

The plaintiffs have not sued Victor Aloush or Ygal Yaakov to recover the purchase price of the diamonds they delivered. Absent proceeds from this lawsuit, Nimish Parikh will not be able to satisfy his guaranty obligations to the plaintiffs.

## II.    Discussion

### A.    Standard for A Motion For Summary Judgment

Summary judgment is proper when the " pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion " may not rest upon the mere allegations or denials of the adverse party' s pleading"; rather, it must respond with " specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). " The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992). A court should grant

a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party.  *Id.*

### B.    Did U.S. Bank Act with Reasonable Care?

The reader will recall that the "international documentary collections" process requires a merchant engaged in the international sale of goods to give the goods to a carrier and have its bank (the "remitting bank") deliver shipping documents to a "collecting bank."  The purchaser then pays the collecting bank or signs a promissory note promising to do so.  In return, the collecting bank gives the shipping documents to the purchaser, who presents them to the carrier and is given possession of the goods.  Here, the plaintiffs contend that U.S. Bank's release of delivery documents to Tel Aviv Diamond was a breach of contract and negligence because U.S. Bank failed to exercise ordinary care when it did not ensure that the delivery documents for the diamonds were complete and correct.

### 1.    The *Moorman* Doctrine

The court previously denied U.S. Bank's motion to dismiss the plaintiffs' negligence claims based on the economic loss doctrine, which prohibits recovery in tort for purely economic losses, subject to certain limited exceptions.  *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill.2d 69 (Ill. 1982) (defining the economic loss doctrine in the context of a products liability action); *see also Congregation of the Passion v. Touche & Ross Co.*, 159 Ill.2d 137, 159-60 (Ill. 1994) (extending the reach of the economic loss doctrine to the context of service agreements where the remedy sought by the plaintiff stems from contractual liability).

As the court noted, one of the exceptions is that a plaintiff may recover if the tort committed by the defendant is based on an extracontractual duty.  *See Congregation of the*

*Passion*, 159 Ill.2d at 162.  The plaintiffs argued that U.S. Bank owed them an extracontractual duty separate and apart from their contractual relationship because U.S. Bank was a consignee and bailee of the diamonds and thus owed it a fiduciary duty separate and apart from the duties owed by U.S. Bank due to the parties' contract.  In contrast, U.S. Bank contended that it did not have an extracontractual duty to the plaintiffs because all of the duties it owed to the plaintiffs existed solely due to the existence of the parties' contract.

The court denied U.S. Bank's motion to dismiss based on the plaintiffs' characterization of U.S. Bank as a bailee and their claim that U.S. Bank owed them a fiduciary duty.  In Illinois, a bailment requires:  (1) an agreement by the bailor to transfer or deliver goods; (2) the bailee's agreement to accept exclusive possession of goods for a specified purpose; (3) the actual delivery or transfer of exclusive possession of the property of the bailor to the bailee; and (4) acceptance of exclusive possession by the bailee.  *In re Midway Airlines, Inc.*, 383 F.3d 663, 671 (7th Cir. 2004).  As the summary judgment record makes clear, U.S. Bank never accepted exclusive possession of the diamonds.  Thus, it cannot be a bailee.  *See Cameo Convalescent Center, Inc. v. Percy*, 800 F.2d 108, 110 (7th Cir. 1986) (the court may reconsider interlocutory orders at any time prior to judgment); *Securities Fund Services, Inc. v. American Nat. Bank and Trust Co.*, 542 F.Supp. 323, 328 (N.D. Ill. 1982) (a bailment exists when a bank receives chattel "under a special agreement or under circumstances sufficient to create a trust").

The parties have not addressed whether U.S. Bank otherwise owed a fiduciary duty to the plaintiffs above and beyond the duties established via their contract.  Based on the court's review of the record, it is unclear if the plaintiffs' position regarding U.S. Bank's extracontractual duties

was based solely on their belief that U.S. Bank acted as a bailee. Thus, the court will reach the merits of the plaintiffs' negligence claim.

### 2.    The Plaintiffs' Contract & Negligence Claims – Duty of Care

In Illinois, to establish breach of contract, a plaintiff must show: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007), *citing W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill.App.3d 752 (1st Dist. 2004). The plaintiffs' focus is on prong three, as they contend that U.S. Bank breached its contractual duty under the URC and the UCC to act with reasonable care. *See* URC 522 Article 9 ("Banks will act in good faith and exercise reasonable care"); 810 ILCS § 5/4-501 (UCC governs handling of documentary drafts); 810 ILCS § 5/103(a)(7) (defining "ordinary care" for businesses).

In turn, the elements required to establish common law negligence in Illinois are: (1) failure to exercise ordinary care; (2) causation; and (3) damages. *See, e.g., Thompson v. County of Cook*, 154 Ill. 2d 374, 382 (Ill. 1993); *Corgan v. Muehling*, 143 Ill.2d 296, 302 (Ill. 1991) (negligence requires "duty, breach, causation and damages"). As with their breach of contract claim the plaintiffs' arguments about negligence focus on U.S. Bank's alleged failure to exercise reasonable care.

Generally, the question as to whether a defendant bank exercised reasonable care is a fact question that must be resolved by a jury. *See, e.g., Wilder Binding Co. v. Oak Park Trust and Sav. Bank*, 135 Ill.2d 121, 131 (Ill. 1990) (jury should consider whether the defendant's use of automated check-sorting equipment and its practice of paying checks drawn for less than $1,000

without manually verifying signatures on those checks is "consistent with general banking usage" and thus "prima facie constitutes the exercise of ordinary care"). This is, however, not a hard and fast rule, as the court can grant summary judgment when only one conclusion can be drawn from the uncontested facts. *See National Diamond Syndicate, Inc. v. United Parcel Service, Inc.*, 897 F.2d 253, 263-64 (7th Cir. 1990) (defendant carrier was entitled to summary judgment where uncontested facts did not "give rise to a reasonable inference of suspiciousness such that [the carrier] should be held liable" for accepting forged checks in connection with a C.O.D. shipment of diamonds).

The court thus will consider whether U.S. Bank satisfied its obligation to exercise reasonable care. As noted above, the UCC defines "ordinary care" for businesses as the "observance of reasonable commercial standards, prevailing in the area in which the person is located with respect to the business in which the person is engaged . . . . " 810 ILCS § 5/103(a)(7). URC 522 requires banks to "exercise reasonable care." URC at Art. 9. It also provides that banks are not responsible for "the form, sufficiency, accuracy, genuineness, falsification or legal effect of any document(s) . . . . or for the good faith or acts and/or omissions . . . of the consignors, the carriers, the forwarders, the consignees, or the insurers of goods, or any other person whomsoever." URC at Art. 13. In addition, collecting banks, like U.S. Bank, are "responsible for seeing that the form of the acceptance of a bill of exchange appears to be complete and correct, but is not responsible for the genuineness of any signature or for the authority of any signatory to sign the acceptance." URC at Art. 22. Finally, a collecting bank is "not responsible for the genuineness of any signature or for the authority of any signatory to sign a promissory note, receipt, or other instruments." URC at Art. 23.

As U.S. Bank correctly observes, banks involved in a documentary collection do not guarantee payment or assume credit risks, unlike a situation when a bank issues a letter of credit. *Texful Textile Ltd. v. Cotton Exp. Textile, Inc.*, 891 F.Supp. 1381, 1388 (C.D. Cal. 1995) ("Even a brief review of the nature of documentary collections shows that by definition, banks operate solely as conduits in these transactions. Indeed, this is one reason why they are considered riskier than letters of credit"), *quoting* John B. Hendricks, "Financing the Export Transaction," 458 PLI/Commercial Law and Practice Course Handbook Series 55 at p.2 (May 1, 1988) (remitting and collecting banks neither guarantee payment nor assume any credit risk; they "merely as intermediaries to facilitate payment for the goods"), and Menachem Mautner, "Letter-of-Credit Fraud: Total Failure of Consideration, Substantial Performance and the Negotiable Instrument Analogy," 18 Law & Policy International Bus. 579 at p.9 (1986) ("the seller's expectation interest is not protected under the collection transaction. The seller ships goods in reliance on the buyer's contractual undertaking to effect payment to the seller, but not in reliance on such an undertaking on the part of the bank"). With these principles in mind, the court turns to the plaintiffs' arguments.

According to the plaintiffs, U.S. Bank breached its duty of care because it failed to ensure that the delivery documents were complete and correct since they referred to "Tel Aviv Diamonds and Jewelry, Inc." as opposed to "Tel Aviv Diamond." They reason that since U.S. Bank knew that Mr. Yaakov was doing business under the name "Tel Aviv Diamond" and had never incorporated his company, it failed to ensure that the form of acceptance of a bill of exchange was complete and correct as required by the URC.

In support, the plaintiffs point to Ms. Malit's testimony that the collection documents were incomplete and incorrect because they were addressed to "Tel Aviv Diamonds and Jewelry, Inc." but were signed by "Tel Aviv Diamond." There are three major problems with Ms. Malit's testimony. First, she is not a lawyer, does not work in the international collections department, and testified that she had never seen URC prior to her deposition and had no knowledge about Article 22. U.S. Bank's counsel correctly objected to questions calling for legal conclusions during Ms. Malit's deposition, given that any opinions she might have about Article 22 lack foundation and thus are inadmissible. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994) (to defeat a motion for summary judgment, the nonmoving party must produce "evidence of evidentiary quality" which means it must be admissible at trial).

Second, a witness' analysis of legal issues is inappropriate, given that the court must resolve legal questions. *Amakua Development LLC v. Warner*, No. 05 C 3082, 2007 WL 2028186 at *17 (N.D. Ill. Jul. 10, 2007). Thus, even if Ms. Malit was somehow qualified to opine on legal matters, she still would not be permitted to testify about any legal conclusions she might draw. Third, Ms. Bruneau, not Ms. Malit, was U.S. Bank's Rule 30(b)(6) witness regarding U.S. Bank's services as a collecting bank so the plaintiffs' characterization of her as U.S. Bank's Rule 30(b)(6) designee is incorrect. Ms. Malit's so-called admission is, therefore, inadmissible and in any event would be irrelevant.

The plaintiffs next argue that U.S. Bank's position that it considered "Tel Aviv Diamond" to be the same entity as "Tel Aviv Diamonds and Jewelry, Inc." "defies credulity" and is "specious." Response at 7. The court disagrees because the evidence unequivocally shows that

Ms. Malit could not have reasonably known that they were in fact different entities. In this regard, U.S. Bank is entirely correct in its summary of the relevant evidence:

- It is uncontested that Mr. Aloush was the self-styled "President" of the non-existent "Tel Aviv Diamonds and Jewelry, Inc.," which had the same address, suite number, phone number, and fax number as Tel Aviv Diamond. Mr. Aloush conceived of "Tel Aviv Diamonds and Jewelry, Inc.," created a business card representing that he was the President of this entity, and abandoned his prior entity ("Tal Aviv Loose Diamonds & Jewelry, Inc.") to create the illusion that he was affiliated with Ygal Yaakov and Tel Aviv Diamond so Indian diamond sellers would do business with him.

- Nishit Parikh, a broker, investigated Tel Aviv Diamond before he referred Mr. Aloush to Nimish Parikh. It is undisputed that Nishit Parikh – an individual in the thick of the diamond world who was familiar with Tel Aviv Diamond and Mr. Yaakow – thought that Mr. Aloush was associated with Tel Aviv Diamond and based on this belief, referred Mr. Aloush to Nimish Parikh in India.

- The plaintiffs chose to do business with Victor Aloush. Neither Nimish Parikh nor the plaintiffs investigated Victor Aloush or his purported company. Instead, they relied exclusively upon Nishit Parikh's referral.

- The Monarch Gems collection papers received by U.S. Bank indicated that they were intended for Tel Aviv Diamond and Jewelry, Inc. at 5 South Wabash Avenue, Suite 705, Chicago, Illinois.

- Mr. Yaakov and his company, Tel Aviv Diamond, are located at 5 South Wabash Avenue, Suite 705, Chicago, Illinois. Mr. Yaakov was a U.S. Bank customer and had dealt with Julie Malit for several years.

- Malca-Amit called Mr. Yaakov at his office – which had the same address, suite number, phone number, and fax number as Tel Aviv Diamonds and Jewelry, Inc. – to advise him that there was a shipment at U.S. Bank that needed to be released.

- Mr. Yaakov of Tel Aviv Diamond and Nishit Parikh went to U.S. Bank together to meet with Julie Malit to sign for the Monarch Gems' collection papers. Mr. Yaakov signed the required promissory note accepting Monarch Gems' terms on behalf of Tel Aviv Diamonds and Jewelry, Inc. and accepted the documents.

- Mr. Yaakov did not voice any concerns about his authority to sign for the documents, and testified that Ms. Malit would have had no reason to conclude that the documents were not meant for him and his company.

- Nishit Parikh, the broker who arranged the transaction, was present when Mr. Yaakov signed for the papers. As the broker, Nishit Parikh guaranteed that any purchaser of diamonds he found would pay the seller, and was aware that by doing this, he was "taking a fairly big personal risk." Nimish Parikh, like Mr. Yaakov, did not voice any concerns about Mr. Yaakov's ability to sign for the documents.

- The Kiran Exports collection documents received by U.S. Bank similarly indicated that they were intended for Tel Aviv Diamond and Jewelry, Inc. at 5 South Wabash Avenue, Suite 705, Chicago, Illinois.

- Mr. Yaakov sent Shay Sadina, an employee of Tel Aviv Diamond whom Julie Malit knew, and who had authority to sign on behalf of Tel Aviv Diamond, to pick up and sign the Kiran Export shipping documents, including a promissory note agreeing to pay for the Kiran Exports diamond shipment.[3]

- Ms. Bruneau testified that "it is not uncommon for banks overseas to send us [U.S. Bank] documents and not have the name of the companies absolutely perfect. At lot of times them have them jumbled up, in the wrong order." The plaintiffs did not adduce any contradictory evidence on this point, and the names in this case were almost identical.

Even when this evidence is viewed in the light most favorable to the plaintiffs, there is only one rational conclusion: barring some sort of psychic ability, Ms. Malit simply could not have known or even imagined that there was any sort of problem with the transaction. This is especially true given that Mr. Yaakov and his authorized deputy came to U.S. Bank and signed the promissory notes and collection documents on behalf of Mr. Yaakov's company, Tel Aviv Diamond, and Nishit Parikh, the broker who arranged the transaction and was personally liable for any non-payment, was present when Mr. Yaakov signed for the Monarch Gems papers.

---

[3] Given that Shay Sadina was an employee of Tel Aviv Diamond, Ms. Malit knew Mr. Sadina from prior transactions between U.S. Bank and Tel Aviv Diamond, and knew that he had authority to sign on behalf of Tel Aviv Diamond, the plaintiffs' assertion that Mr. Sadina was not associated with U.S. Bank is irrelevant. Ms. Malit dealt with Mr. Sadina in his capacity as an individual authorized to sign for Tel Aviv Diamond, so the fact that Mr. Sadina had no relationship with U.S. Bank is meaningless. Mr. Sadina, therefore, was interchangeable with Mr. Yaakov, who also had authority to sign for Tel Aviv Diamond.

These facts simply do not demonstrate that there is a triable issue of fact as to whether U.S. Bank failed to exercise reasonable care. *See Thiagarajar Mills, Ltd. v. Thornton*, 242 F.3d 710, 713 (6th Cir. 2001) (affirming summary judgment in favor of a collecting bank in a documentary collection on behalf of the seller goods which turned out to be worthless because "[e]xercising reasonable care as the remitting bank in this case does not mandate inquiry as to the bona fides of the documents involved beyond facial examination thereof"); *Banco Surinvest, S.A. v. Suntrust Bank*, 78 F.Supp.2d 1366 (N.D. Ga. 1999) (collecting bank in a documentary collection had no duty to look beyond the contract and perform tasks without instruction from the remitting bank).

Fundamentally, the only thing that could have tipped U.S. Bank off was the addition of the words "and Jewelry, Inc." This would not have drawn the notice of a reasonable collecting bank given that this was a subtle nuance, the uncontested evidence shows that names can get jumbled due to language issues, and – at the risk of being repetitive – Mr. Yaakov was in the diamond business, his information was virtually identical to the listed information, and he actually came to the bank with the diamond broker who arranged the deal and signed a promissory note along with the collection documents. In short, based on all of the facts discussed above, U.S. Bank could not have reasonably known that "the form of the acceptance of a bill of exchange" was not complete and correct since they could not have known and were not required to ascertain that Mr. Aloush had duped the plaintiffs into thinking that he was associated with Tel Aviv Diamond. *See* URC at Art. 22.

Indeed, there is no question in the court's mind that if it had conducted a jury trial in this matter, it would have granted a motion for a directed verdict based on the evidence that is before

it. This is especially true since neither the UCC nor the URC requires a collecting bank to earn its $85 fee by investigating transactions and rendering opinions as to their wisdom. See URC 522, Art. 13 (banks are not responsible for "the form, sufficiency, accuracy, genuineness, falsification or legal effect of any document(s) . . . . or for the good faith or acts and/or omissions . . . of the consignors, the carriers, the forwarders, the consignees, or the insurers of goods, or any other person whomsoever"). Accordingly, there is no material issue of disputed fact as to whether U.S. Bank exercised reasonable and ordinary care and U.S. Bank is entitled to summary judgment on this issue.

### 3. The Plaintiffs' Contract and Negligence Claims – Proximate Cause

In the interests of completeness, the court will briefly address U.S. Bank's fall-back argument that Mr. Aloush received the diamonds exactly as the plaintiffs intended and Mr. Aloush's failure to pay for the diamonds was the proximate cause of the plaintiffs' losses, not U.S. Bank's release of the documents to Tel Aviv Diamond. It is uncontested that the plaintiffs contracted with Mr. Aloush and that upon receipt, Mr. Yaakov immediately gave both diamond shipments to Mr. Aloush, who then proceeded to renege on his promise to pay for the diamonds.

To prevail on their breach of contract and negligence claims against U.S. Bank, the plaintiffs must show that U.S. Bank's conduct was the proximate cause of their loss. *See Universal Mfg. Co. v. Gardner, Carton & Douglas*, 207 F.Supp.2d 830, 843 (N.D. Ill. 2002) (granting summary judgment in favor of the defendant as to negligence and breach of contract claims based on the plaintiff's failure to point to evidence showing that its damages were proximately caused by the defendant's conduct). The plaintiffs state today that if U.S. Bank had

told them that the bills of exchange were not complete and correct, they would have halted the transactions and instructed the courier to return the diamonds to them.

Given that the plaintiffs intended for the diamonds to go to Victor Aloush and thought that he was associated with Mr. Yaakov and Tel Aviv Diamond, this argument is flatly at odds with the evidence in the record. Instead, it is an example of the adage that hindsight is 20/20 vision. In any event, for the reasons discussed above, U.S. Bank could not have reasonably known that the bills of exchange were not complete and correct. Thus, it cannot be liable for its failure to realize and point out that Mr. Aloush was scamming the plaintiffs by engaging in a successful plot to bamboozle them into thinking that he was a reputable person associated with Mr. Yaakov's "Tel Aviv Diamond." The court thus finds that even if the plaintiffs were able to withstand summary judgment as to U.S. Bank's duty of care, their damages flow from their decision to sell diamonds to Mr. Aloush, not anything that U.S. Bank did. This is a separate and additional reason why their breach of contract and negligence claims against U.S. Bank fail as a matter of law.

## III.    Conclusion

For the reasons set forth above, U.S. Bank's motion for summary judgment [#124] as to Monarch Gems and Kiran Exports' breach of contract and negligence claims is granted in its entirety. This disposes of all claims as to all parties, as the court previously granted a motion to dismiss filed by the other defendant, Malca-Amit, and only claims brought by Monarch Gems and Kiran Exports against U.S. Bank survived that ruling. Accordingly, the clerk is directed to enter a Rule 58 judgment and to terminate this case from the court's docket. The court also

thanks counsel for their unusually well-researched, organized, and written Rule 56 statements and briefs.

DATE:   September 27, 2007

*Blanche M. Manning*
Blanche M. Manning